UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
------------------------------------------x
                                           :
NATHANIEL L. PRINCE,                       :
                                           :
                      Plaintiff,           :        13 Civ. 7666 (TPG)
                                           :
          - against -                      :        **ORDER**
                                           :
                                           :
CAROLYN W. COLVIN, Commissioner of         :
Social Security,                           :
                                           :
                      Defendant.           :
                                           :
                                           :
------------------------------------------x
```

On March 9, 2015, this court received a Report and Recommendation from Magistrate Judge Peck regarding the above-captioned case. Since that time, no objections have been received, and no adjournment of the due date was requested.

The Court adopts Magistrate Judge Peck's Report and Recommendation as its opinion. The Commissioner's motion for judgment on the pleadings (Dkt. No. 12) is denied, and Prince's motion for judgment on the pleadings (Dkt. No. 24) is granted to the extent of remanding the case to the Commissioner for further proceedings consistent with the Magistrate Judge's Report and Recommendation.

The Clerk of the Court is directed to remove docket items 12 and 24 from the court list of open motions and to close the file.

SO ORDERED.

Dated:   New York, New York
         March 27, 2015

Thomas P. Griesa
U.S.D.J.

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 3/27/15

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

NATHANIEL L. PRINCE,                          :

                    Plaintiff,                :          13 Civ. 7666 (TPG) (AJP)

         -against-                        :   **REPORT AND RECOMMENDATION**

CAROLYN W. COLVIN, Commissioner of      :
Social Security,

                             :

                  Defendant.              :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**ANDREW J. PECK, United States Magistrate Judge:**

**To the Honorable Thomas P. Griesa, United States District Judge:**

        Nathaniel Prince, represented by counsel, brings this action pursuant to § 205(g) of

the Social Security Act, 42 U.S.C. § 405(g), challenging the final decision of the Commissioner of

Social Security (the "Commissioner") denying him Disability Insurance Benefits ("DIB") and

Supplemental Security Income ("SSI") benefits.  (Dkt. No. 2: Compl.)  Presently before the Court

are the parties' cross-motions for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c).  (Dkt.

No. 12: Gov't Motion; Dkt. No. 24: Prince Motion.)

        For the reasons set forth below, the Commissioner's motion for judgment on the

pleadings (Dkt. No. 12) should be <u>DENIED</u>, and Prince's motion for judgment on the pleadings

(Dkt. No. 24) should be <u>GRANTED</u> to the extent of remanding the case to the Commissioner for

further proceedings consistent with this Report and Recommendation.

**<u>FACTS</u>**

**<u>Prior Proceedings</u>**

        Prince applied for DIB on November 20, 2012 and for SSI on November 21, 2012,

2

alleging disability since September 10, 2012.  (Dkt. No. 9: Administrative Record ("R.") 119, 129.)

The Social Security Administration ("SSA") denied Prince's application on February 28, 2013.  (R.

60-73.)  On August 1, 2013, Prince had a hearing before Administrative Law Judge ("ALJ") Mark

Hecht.  (R. 31-59.)  On August 15, 2013, ALJ Hecht denied Prince's claim.  (R. 7-20.)  The Appeals

Council denied review on October 9, 2013.  (R. 1-3.)  The period at issue for Prince's application

runs from September 10, 2012, when Prince alleged he became disabled, through August 15, 2013,

the date of ALJ Hecht's decision.  (R. 20.)

**Non-Medical Evidence & Testimony**

Prince was born in January 1963 and was between forty-nine and fifty years old

during the period at issue.  (R. 119.)  Prince is a high school graduate with one year of college

courses.  (R. 38.)  Prince's past relevant work includes a job as a helper on a water delivery truck.

(R. 38, 172, 310.)

Prince lives with his girlfriend and three children.  (R. 49, 310.)  He spends his days

caring for his three-year-old autistic son, his infant child and a pet cat.  (R. 49, 148-49, 313.)  He

uses public transportation and rides a bicycle.  (R. 151-53.)  In January 2013, he reported that his

girlfriend does all the cooking, although he prepared meals of cereal, tuna, and peanut butter and

jelly sandwiches daily.  (R. 150-51.)  Prince also reported needing no help to change cat litter, sweep

and mop the floor or wash dishes.  (R. 151.)  He went outside daily in the morning and stated that

he could walk, ride a bicycle and use public transportation.  (Id.)  Prince visits doctors three times

per month.  (R. 152.)  Prince reported avoiding crowds in order to avoid triggering his panic attacks,

which he said occur daily and are characterized by shortness of breath, anger, fast heartbeat and

shaking.  (R. 149, 152-53, 161.)

Prince testified that since witnessing the September 11, 2001 attacks, he has had

3

difficulty with crowds. (R. 37.) For seven years after the attack, Prince worked on a truck that delivered water. (R. 38-39.) He lost his job in 2008 due to a change in the company's ownership, and not because he could not work. (R. 38-39.) After Prince was laid off, he was unable to find any work. (R. 40, 51.)

Prince takes medication that helps with his bipolar disorder but he has side effects including inability to walk straight. (R. 44.) Prince claims to suffer from post-traumatic stress disorder ("PTSD") from the September 11th terrorist attacks and to see "certain things," but he has never received treatment for the condition. (R. 44-45.) Prince also claimed to experience back pain every other day in his middle and lower back that prevents him from moving, but when asked about the lack of treatment, he said "nothing wrong with my back but my doctors told me it's something wrong with my back. " (R. 45-46.) Prince was diagnosed with ADHD as a child, attended special education classes, and is dyslexic. (R. 46-47.) Prince testified that he sometimes experiences severe chest pain and was diagnosed with a heart murmur at Mt. Sinai in April 2013. (R. 47.) He has not been prescribed any medication for his back pain or a heart condition. (R. 46-47.)

Prince testified that he can sit for only seven minutes before needing to get up and walk and could stand for only ten minutes before needing to move. (R. 48.) Prince further claimed he could walk only one block. (Id.) Prince previously reported being able to walk one mile. (R. 155.) He claimed that his right hand had been "locking up" since March 2013, and that he has not used a computer since then. (R. 48-49.) Prince testified that he cannot do any household chores, including grocery shopping, cooking, cleaning or laundry. (R. 49.) His hobby is playing chess at a friend's house; he and his friend "sit there and we play a couple games of chess." (R. 50.)

Prince's girlfriend testified that he got "antsy" in crowds due to his anxiety. (R. 53.) She stated that Prince had anxiety since she lost her job in 2009. (Id.) She stated that before Prince

4

began anxiety treatment in September 2012, he self-medicated with illegal drugs but stopped in June 2012. (R. 55-56.)  She described the side effects of Prince's current medication as including drowsiness and lethargy. (R. 57-58.)  She also testified that Prince could not sit still because of his ADHD, unless it is something he "really want[s] to do, as in chess . . . ." (R. 58.)

**Medical Evidence**

### Prior To September 2012

In January 2011, Dr. Neha Garg at the Lincoln Hospital outpatient clinic saw Prince to follow-up on an asthma treatment plan. (R. 260-63.)  Dr. Garg noted that Prince recently had been seen in the emergency room for asthma after running out of medication. (R. 261.)  Dr. Garg diagnosed Prince with moderate persistent asthma. (R. 262.)

In February 2011, Prince was seen at the Lincoln Hospital emergency room for shortness of breath. (R. 253-59, 264-65.)  He received treatment for acute asthma exacerbation due to exposure to automobile fumes and was discharged home. (R. 251, 254-55, 265.)  Prince returned to the emergency room for asthma exacerbations in April, May, June and December 2011. (R. 226-30, 236-40, 244-45, 246-49, 271-75.)  During his July 2011 visit, Prince stated that he had not been in compliance with his asthma medication. (R. 233.)

During a May 2011 visit to the Lincoln Hospital clinic, Prince admitted to heavy binge drinking several times a week. (R. 242.)  Dr. Andrew Burger assessed Prince with "[l]ate effect ethanol excess with blackout spells and dizziness." (Id.)  Dr. Burger noted that Prince was alert and oriented and had normal cognition. (Id.)  At an August 2011 visit to the Lincoln Hospital clinic, Prince tested positive for cocaine, although he denied using it. (R. 220.)  In September 2011, Prince was discharged from the mental health clinic at Lincoln Hospital because he had attended only three sessions of an alcohol and drug rehabilitation program. (R. 231.)

5

In January 2012, Prince was seen at the Mount Sinai outpatient clinic for his asthma, which he reported was triggered by dust and weather changes.  (R. 289-90.)  Prince stated that he used Albuterol when he exercised but otherwise did not need it.  (R. 289.)  Physical examination of Prince was unremarkable, including regular heart rhythm, lungs clear to auscultation,[1] without wheezing or rales,[2] normal gait, and no clubbing, cyanosis[3] or edema.[4]  (R. 290.)  Prince was fully alert and oriented.  (Id.)  Prince was diagnosed with asthma and bipolar disorder.  (Id.)

In April 2012, Prince visited the Mount Sinai outpatient clinic and reported that he last used cocaine two weeks earlier and drank six beers a week.  (R. 285-86.)  Prince stated that he used Albuterol five times a week, especially before exercising and when walking up the stairs in the subway.  (R. 285.)  His physical examination results included normal gait, no clubbing, cyanosis, or edema and lungs clear to auscultation with no wheezing or rales.  (R. 286.)  Prince reported current cocaine use and that he was participating in a drug recovery program at Lincoln Medical Center.  (R. 285-87.)

### Medical Evidence From September 2012 Through August 2013

#### AllMed Rehab of NY

From September 2012 through July 2013, Prince received treatment at AllMed and

---

[1]   "Auscultation" is the act of listening for sounds within the body, chiefly for ascertaining the condition of the lungs.  Dorland's Illustrated Medical Dictionary at 180 (32d ed. 2012).

[2]   A "rale" is a discontinuous sound heard primarily during inhalation.  Dorland's Illustrated Medical Dictionary at 1576.

[3]   "Cyanosis" is a bluish discoloration, especially of the skin and mucous membranes due to the excessive concentration of blood that does not contain oxygen.  Dorland's Illustrated Medical Dictionary at 452.

[4]   "Edema" refers to the presence of abnormally large amounts of fluid in the intercellular tissue spaces of the body.  Dorland's Illustrated Medical Dictionary at 593.

6

Rehabilitation of NY. (R. 197-210, 324.) Following an initial evaluation by a nurse practitioner, Prince was diagnosed with bipolar disorder, although the nurse's notes do not include any clinical findings. (R. 210.) Prince was prescribed Zyprexa and Klonopin. (R. 210.)

On September 27, 2012, Prince was seen by treating psychiatrist Dr. Edward Fruitman. (R. 208.) Prince stated that in March 2012, the New York City Administration for Children's Services had taken his children away as a result of drug use by his girlfriend and him, but that the children since had been returned. (Id.) Prince was living with all three of his children, then ages fifteen, two, and five months. (Id.) Dr. Fruitman diagnosed Prince with bipolar disorder. (Id.)

On November 12, 2012, Prince saw Dr. Fruitman again and reported felling "OK." (R. 205.) Prince was fully oriented, had clear speech and was goal directed. (Id.) Dr. Fruitman wrote a letter stating that Prince was attending AllMed for mental health services. (R. 206.) The letter noted Prince's report that his medications made him drowsy but were helping with his mood disorder. (Id.) The letter also stated that Prince was compliant with and receptive to his monthly psychiatric treatment. (Id.) On November 26, 2012, Dr. Fruitman noted that Prince was in a good mood, and Prince stated that his medication no longer made him tired. (R. 203.) Dr. Fruitman prepared another letter, which stated that Prince's medication was helping with his anxiety and mood swings, and "his body has adjusted to the medication and he no longer gets drowsy upon intake." (R. 204.)

On December 20, 2012, Dr. Fruitman found that Prince's mood was stable, his anxiety was controlled, and he had no side effects from medication. (R. 202.) On December 27, 2012, Prince reported to Dr. Fruitman that he felt good because he was with his daughter for Christmas. (R. 198.) Dr. Fruitman noted that Prince had family support. (Id.) Once again, Dr. Fruitman wrote a letter stating that Prince was compliant and "doing well" with his mental health

Case 1:13-cv-07666-TPG    Document 35    Filed 03/27/15    Page 8 of 42
Case 1:13-cv-07666-TPG-AJP    Document 34    Filed 03/09/15    Page 7 of 41

7

treatment.  (R. 199-200.)

On July 17, 2013, Dr. Fruitman prepared another letter concerning Prince's condition and treatment.  (R. 324.)  He stated that Prince's current diagnoses were PTSD, schizoaffective disorder and anxiety.  (Id.)  Dr. Fruitman also stated that Prince received "pain management services" at the clinic and needed "to use his single axis cane for his pain management regimen/myalgia." (Id.)  Dr. Fruitman concluded that Prince "currently is unfit to work." (Id.)

### Lincoln Medical Center

Prince was seen by the Lincoln Medical emergency department for shortness of breath on three occasions.  (R. 218, 221-22, 223-25, 279-81.)  On September 27, 2012, Prince was seen for an acute asthma exacerbation and treated with Albuterol and Prednisone.  (R. 223-25.)  Prince reported that he experienced asthma attacks "only with extreme physical exertion." (R. 224.)  Prince's chest x-rays were normal.  (R. 218.)  On November 27, 2012, Prince complained of shortness of breath.  (R. 221-22.)  His oxygen saturation level was ninety-seven percent, with a peak flow level of 220 liters per minute.  (R. 221.)  Prince received nebulizer treatment.  (R. 222.)  On January 21, 2013, Prince again was seen for shortness of breath.  (R. 279-81.)  Prince reported that he exercised seven times a week without exacerbation until that day.  (R. 279.)  Prince's oxygen saturation was ninety-eight percent, with a peak flow level of 270 liters per minute, and his lungs were clear, with no wheezing.  (Id.)  Prince received two Albuterol treatments and refused a third. (R. 280.)  His peak flow increased to 450 liters per minute.  (Id.)

### Mount Sinai Medical Center Outpatient Treatment

On December 28, 2012, Prince was at Mt. Sinai Medical Center and received an echocardiogram from Dr. Joseph Truglio.  (R. 282, 304-05.)  Dr. Truglio noted that Prince "often forgets" to take his asthma medication.  (R. 282.)  Prince reported exercising for one hour each

8

morning.  (Id.)  The EKG was abnormal, showing a sinus rhythm with first-degree atrio-ventricular

block, and non-specific ST and T wave abnormality anteriorly.  (R. 304.)  Acute ischemia[5] could

not be excluded.  (Id.)

### Dr. Vinod Thukral

On January 29, 2013, consultative internist Dr. Vinod Thukral examined Prince.  (R.

316-19.)  Prince's chief complaint was back pain, resulting from a sprain in 2008, precipitated by

standing for about ten to fifteen minutes, bending, lifting, pulling and pushing.  (R. 316.)  Prince said

that he had some relief with rest and pain medication.  (Id.)  Prince described a history of asthma

since 1963, and stated that it was triggered by weather changes and stress and relieved with an

inhaler.  (Id.)  Prince denied any hospital admissions, intubation or steroid dependence due to

asthma.  (Id.)  Prince reported that he went out for walks and socialized with friends, but was unable

to do cooking, cleaning, laundry or shopping due to his back pain.  (R. 317.)  Prince denied any

history of substance abuse.  (Id.)

On examination, Prince was in no acute distress and had both a normal gait and

stance.  (Id.)  Prince performed a full squat and could walk on his heels and toes without difficulty.

(Id.)  He did not require an assistive device, needed no help changing for the examination or getting

on or off the examination table and could rise from a chair without difficulty.  (Id.)  Prince had a

regular heart rhythm with no audible murmur, gallop or rub.  (R. 318)  His chest and lungs were

normal in diameter, clear to auscultation, had normal percussion and diaphragmatic motion, and

---

[5]     "Ischemia" refers to a deficiency of blood in a part, usually due to functional constriction or
actual obstruction of a blood vessel.  Dorland's Illustrated Medical Dictionary at 961 (32d
ed. 2012).

9

there was no significant chest wall abnormality.  (Id.)  Prince had no scoliosis,[6] kyphosis,[7] or

abnormality in his thoracic spine.  (Id.)  His straight leg raising test was negative bilaterally.  (Id.)

X-rays of his thoracic and lumbar spine were negative.  (R. 319-21.)

Prince had a full range of motion in his shoulders, elbows, forearms, wrists, hips,

knees and ankles bilaterally, with no evidence of subluxations, contractures, ankylosis or thickening.

(R. 318.)  His joints were stable and non-tender, with no redness, heat, swelling or effustion.  (Id.)

Prince had no cyanosis, clubbing, edema, significant varicosities, or trophic changes in his

extremities.  (Id.)  Prince's hand and finger dexterity were intact, with full strength bilaterally.  (R.

319.)

Dr. Thukral diagnosed Prince with upper and lower backache by history, asthma by

history, depression by history, and heart murmur by history.  (Id.)  Dr. Thukral opined that Prince

had no limitations in sitting, standing, bending, pulling, pushing, lifting, carrying or "other such

related activities."  (Id.)  Dr. Thukral recommended that Prince "avoid smoke, dust, or other

respiratory irritants due to asthma History."  (R. 319.)

### Dr. Michael Kushner

On January 29, 2013, consultative psychologist Dr. Michael Kushner examined

Prince.  (R. 310-14.)  Prince reported that he lived with his girlfriend and three children.  (R. 310.)

He stated that he had a regular high school diploma.  (Id.)  Prince traveled to his appointment by

subway.  (Id.)  He and his girlfriend jointly managed the household money, and she did most

---

[6]     "Scoliosis" is an appreciable lateral deviation in the normally straight vertical line of the spine.  Dorland's Illustrated Medical Dictionary at 1681 (32d ed. 2012).

[7]     "Kyphosis" is convexity in the curvature of the spine.  Dorland's Illustrated Medical Dictionary at 992.

10

household chores. (R. 312.) Prince reported that he socialized with others and had good family

relationships. (Id.) He reported that he exercised early in the morning and accompanied his children

to and from school, and spent most of his day with his infant child. (R. 312-13.) Prince denied any

history of drug or alcohol use. (R. 311.)

A mental status examination found Prince cooperative, with an adequate manner of

relating and adequate social skills and overall presentation. (Id.) His eye contact was appropriate,

but his motor behavior was somewhat restless. (Id.) Prince was coherent and goal directed, without

hallucinations, delusions or paranoia. (R. 312.) Prince had a full range of affect and appropriate

speech and thought content. (Id.) His mood was neutral, his sensorium was clear, and he was fully

oriented. (Id.) Dr. Kushner evaluated Prince's attention and concentration, finding that Prince

"knew that 2 x 3 was 6, but said that 5 + 7 was 11," and that "[w]hen asked to count backwards from

20 by 3s [Prince] reported '20, 17, 13, 10, 7, 4, 1.'" (Id.) With respect to recent and remote memory,

Prince could repeat three out of three objects immediately, but only one out of three after five

minutes. (Id.) Prince could repeat five digits forward and three backward. (Id.) Dr. Kushner

assessed Prince's cognitive functioning as somewhat below average, with a somewhat limited

general fund of information. (Id.) Prince's insight and judgment were fair. (Id.)

Dr. Kushner diagnosed Prince with psychotic disorder, not otherwise specified. (R.

313.) He opined that Prince could follow and understand simple directions and instruction, perform

simple tasks independently, maintain a regular schedule, learn new tasks and possibly perform some

complex tasks under supervision. (Id.) Dr. Kushner further opined that Prince's psychiatric

impairments may impair his ability to maintain concentration and attention, make appropriate

decisions, relate adequately with others and appropriately deal with stress. (Id.) In sum, Dr.

Kushner's opinion was that "[t]he results of the present evaluation appear to be consistent with

11

psychiatric problems and this may significantly interfere with [Prince's] ability to function on a daily basis."  (Id.)

### Dr. L. Blackwell

On February 26, 2013, Dr. L. Blackwell reviewed the medical evidence of record and completed a psychiatric review form for Prince.  (R. 66-67, 70-71.)  Dr. Blackwell compared Prince's mental impairments to the paragraph "B" criteria of section 12.04 of the listing of impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1 § 12.04.  (R. 66-67.)  Dr. Blackwell found that Prince was mildly limited in his activities of daily living and social functioning, moderately limited in maintaining concentration, persistence or pace, and had no episodes of decompensation.  (R. 67.)  Dr. Blackwell opined that the evidence did not establish the presence of the § 12.04 "C" criteria.  (Id.)

Dr. Blackwell assessed Prince's mental residual functional capacity and found that Prince had no limitations with respect to understanding and memory or in adaptation.  (R. 70-71.)  Dr. Blackwell opined that Prince was not significantly limited in his ability to make simple work-related decisions, carry out very short and simple instructions, sustain an ordinary routine without special supervision, or work in coordination with or in proximity to others without being distracted by them.  (R. 71.)  Dr. Blackwell opined that Prince was not significantly limited in his ability to interact appropriately with the general public, ask simple questions or request assistance, get along with co-workers or peers without distracting them or exhibiting behavioral extremes, maintain socially appropriate behavior and adhere to basic standard of cleanliness and neatness.  (Id.)  Prince, however, was moderately limited in his ability to carry out detailed instructions, maintain attention and concentration for extended periods, perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances, complete a normal workday and workweek

12

without interruptions from psychologically based symptoms, perform at a consistent pace without an unreasonable number and length of rest periods, and accept instructions and respond appropriately to criticism from supervisors. (R. 70-71.) Dr. Blackwell concluded that Prince could "perform semi-skilled work on a sustained basis." (R. 71.)

### SSA Decision-Maker McKercher

On February 27, 2013, non-physician SSA decision-maker P. McKercher assessed Prince's physical residual functional capacity. (R. 68-70.) McKercher found that Prince could occasionally lift or carry up to twenty pounds; frequently lift or carry up to ten pounds; stand, walk or sit (with normal breaks) for about six hours in an eight-hour workday; and had postural limitations of climbing ramps/stairs or ladders/ropes/scaffolds frequently. (R. 68-69.) McKercher found that Prince should "[a]void concentrated exposure" to extreme cold, extreme heat, wetness, humidity and "[f]umes, odors, dusts, gases, poor ventilation, etc." (R. 69.)

### ALJ Hecht's Decision

On August 15, 2013, ALJ Hecht denied Prince's claim for benefits. (R. 7-20.) ALJ Hecht followed a five-step analysis, considering Prince's testimony and the medical record. (R. 11-13.) At the first step, ALJ Hecht determined that Prince "has not engaged in substantial gainful activity since September 10, 2012." (R. 13.)

At the second step, ALJ Hecht determined that Prince "had the following 'severe' impairments: bronchial asthma, a bipolar disorder, and an anxiety disorder." (Id.) ALJ Hecht found that Prince's alleged back pain was not a severe impairment because Prince's "allegations about back pain are not supported by the medical record, and are not credible." (Id.) ALJ Hecht noted that Prince had not been prescribed pain medication; that his records from AllMed, Mt. Sinai and Lincoln Medical Center contained no reference to back pain; and that although he alleged a history

13

of back pain during his consultative examination with Dr. Thukral, the examination was unremarkable, the x-rays were negative, and Dr. Thukral concluded that Prince has no limitations for sitting, standing, walking, or lifting. (Id.) ALJ Hecht also noted Dr. Fruitman's July 2013 letter stating that Prince uses a cane for pain management but making no diagnosis specific to back pain. (R. 13-14.) ALJ Hecht wrote that with "no other mention of treatment for back pain, or even complaints of back pain anywhere in the treatment records, [he did] not accept [Dr. Fruitman's] brief note as establishing that [Prince] has any musculoskeletal disorder that meets the 12-month durational requirement or that causes any significant work related functional limitations." (R. 14.) ALJ Hecht therefore determined that "the medical evidence fails to establish that [Prince] has any 'severe' impairment of the spine or any other disorder that causes the back pain alleged" by Prince. (Id.)

At the third step, ALJ Hecht determined that Prince "does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1." (Id.) ALJ Hecht found that Prince's asthma "clearly does not meet or medically equal the requirements of section 3.03 for bronchial asthma." (Id.) ALJ Hecht determined that  Prince's mental impairments "do not meet or medically equal the requirements of listings 12.04 (for affective disorders), or 12.06 (for anxiety disorders)." (Id.) ALJ Hecht found that Prince has "mild significant restriction" in his activities of daily living, mild limitations in social functioning, and "no more than moderate" difficulties with regard to concentration, persistence or pace. (R. 14-15.) ALJ Hecht noted that Prince has had no episodes of decompensation. (R. 15.)

ALJ Hecht found that Prince has the following residual functional capacity:

[H]e can sit, stand or walk for up to six hours, with normal breaks, in an eight hour

14

workday, and lift/carry/push/pull objects weighing up to 20 pounds occasionally or 10 pounds occasionally (exertional limitations).  From an exertional standpoint, he is limited to light work . . . .  He is also limited to unskilled work involving the performance of simple one or two [step] tasks, and is unable to work in environments with high levels of respiratory irritants (non-exertional limitations).

(Id.)

ALJ Hecht "considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence."  (Id.) He also "considered opinion evidence in accordance with the requirements of 20 CFR 404.1527 and 416.927, and SSRs 96 2p, 96-5p and 96 6p."  (Id.)  ALJ Hecht wrote:

The medical evidence shows that [Prince] has bronchial asthma, which is mild and controlled.  When seen in the Lincoln Medical Center emergency room in September 2012 for a cough and shortness of breath, [Prince] maintained that he gets short of breath only on extreme exertion.  In December 2012, he was seen at the Mt. Sinai emergency room . . . at which time it was noted that he was not compliant with his asthma therapy.  The consultative physical examination performed in January 2013 but Dr. Thukral was normal.  The only restriction cited by Dr. Thukral was to avoid respiratory irritants due to his asthma history.

[Prince] testified that he recently was diagnosed with a heart problem.  A physical examination in December 2012 at Mt. Sinai Hospital revealed a 2-3/6 mild systolic murmur with no radiation, and an EKG at that time showed nonspecific ST and T wave abnormality. [Prince] reported no significant symptoms; the treatment notes state that a follow up echocardiogram would be done.  There is no additional evidence to indicate that [Prince] was diagnosed with a serious cardiovascular impairment.

A review of the record shows that there are no reports in the record that indicate that [Prince] has any significant limitations for exertional activity due to asthma (or any other medical impairment).  In fact, the treatment records mention in December 2012 that [Prince] exercises regularly and [Prince] completed a report dated January 7, 2013 that he can walk one mile.  I therefore conclude that from an exertional standpoint, [Prince] is clearly capable of engaging in light work, and that his asthma causes only a restriction from working in environments with high levels of respiratory irritants.  This was the conclusion of Dr. Thukral and Dr. Blackwell. Their conclusions are consistent with the objective medical evidence and [Prince's] reported activities and are afforded significant weight.

With respect to [Prince's] mental impairments, the record indicates that [Prince] has been treated at AllMed Medical and Rehabilitation since September 10, 2012.  At the

15

initial evaluation, [Prince] reported that he had a history of alcohol and cocaine abuse discontinued four months prior. This is consistent with [Prince's] testimony at the hearing. He also gave a history of being diagnosed with bipolar disorder. He was prescribed Zyprexa and Klonipin. On November 12, 2012 he reported drowsiness from his medications, but on November 26, 2012 and on later visits he reported that his medications were no longer making him drowsy. No other side effects were reported. The treatment notes do not include results of mental status exams. However, on November 19, 2012, it was reported that he had no mood instability. On December 27, 2012, he reported feeling good. On December 27, 2012, Dr. Fruitman reported that [Prince] was doing well in treatment.

(R. 16, record citations omitted.) ALJ Hecht went on to discuss Dr. Kushner's consultative psychiatric evaluation in detail. (R. 16-17.) ALJ Hecht referred to Dr. Kushner's opinion that Prince could "follow and understand simple directions and instructions, perform simple tasks independently, maintain a regular schedule, learn new tasks, and may be able to perform some complex tasks under supervision." (R. 17.) ALJ Hecht noted that Dr. Kushner "concluded that [Prince's] ability to make appropriate decisions, maintain attention and concentration, relate adequately with others, and appropriately deal with stress may be impaired by [his] psychiatric problems." (R. 17, record citation omitted.) ALJ Hecht also observed that "[r]eview psychologist Blackwell concluded in February 2013 that [Prince] had no more than moderate work-related functional limitations in all areas of mental functioning and that his mental impairment was not disabling." (Id., record citations omitted.)

In determining Prince's credibility, ALJ Hecht found that "[t]here is little objective evidence of any impairment causing exertional limitations" and that Prince's testimony "is not supported by any objective medical evidence in the record and is not at all credible." (Id.) With respect to Prince's mental impairments, ALJ Hecht found that Prince's testimony was contradicted by his employment history, his treatment records, and the results of his consultative examination. (R. 17-18.) ALJ Hecht specifically noted that although the "consultative psychiatric examination

did indicate some problems with concentration[,] . . . the overall examination did not show disabling symptoms and . . . the results of the examination are somewhat put into question due to [Prince's] lack of candor concerning his drug history." (R. 18.) ALJ Hecht determined that "[w]hile it is clear that [Prince] has a diagnosed mental illness, . . . he has attempted to portray himself as a lot more impaired than he actually is." (R. 17-18.)

ALJ Hecht next determined that Prince "is unable to perform his past relevant work" as a truck helper "delivering bottled water from a truck," which "had medium exertional demands." (R. 18.)

At the fifth step, ALJ Hecht found that "[c]onsidering [Prince's] age, education, work experience, and residual functional capacity, jobs exist in significant numbers in the national economy that [Prince] could perform." (Id.) ALJ Hecht relied exclusively upon the medical-vocational guidelines in Appendix 2 of Subpart 2 of the Regulations to provide a framework for his decision; he did not call a vocational expert to testify. (R. 18-19.) ALJ Hecht discussed the standard for relying upon the medical-vocational guidelines, but omitted any discussion of when a vocational expert's testimony is required. (Id.) In applying the guidelines as a framework for considering Prince's case, ALJ Hecht wrote:

> If [Prince] had the residual functional capacity to perform the full range of light work, considering [his] age, education, and work experience, a finding of "not disabled" would be directed by Medical-Vocational Rule 202.13. In this case, [Prince's] additional limitations have little effect on the occupational base of unskilled light work. A finding of "not disabled" is therefore appropriate under the framework of this rule. [Prince's] environment restrictions from his mild, controlled asthma clearly do not significantly reduce the number of sedentary and light jobs available to [him]. Further, SSR 85-15 provides that the basic mental demands of competitive, remunerative, unskilled work include the abilities (on a sustained basis) to understand, carry out, and remember simple instructions; to respond appropriately to supervision, coworkers, and usual work situations; and to deal with changes in a routine work setting. A substantial loss of ability to meet any of these basic work-related activities would severely limit the potential occupational base. The record

17

> shows that [Prince] has the ability to meet these mental demands of unskilled work.
> Since [Prince] still retains the residual functional capacity to carry out those basic
> mental demands of unskilled work, there exists no significant erosion of the
> occupational base.

(R. 19.) ALJ Hecht therefore found that Prince "was not under a 'disability' . . . at any time from

September 10, 2012 through the date of this decision," and was not entitled DIB or SSI benefits.

(R. 19-20.)

On September 4, 2013, Prince requested Appeals Council review of ALJ Hecht's

decision. (R. 5.) Prince argued that "I am disabled. I believe the hearings decision was unfair. Due

to my mental condition I see and hear things. I am paranoid and I cannot be around people, which

limits me from working." (R. 5.) On October 9, 2013, the Appeals Council denied review (R. 1-3),

and thus ALJ Hecht's decision became the final decision of the Commissioner.

## ANALYSIS

### I.     THE APPLICABLE LAW

#### A.     Definition Of Disability

A person is considered disabled for Social Security benefits purposes when he is

unable "to engage in any substantial gainful activity by reason of any medically determinable

physical or mental impairment which can be expected to result in death or which has lasted or can

be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A),

1382c(a)(3)(A); see, e.g., Barnhart v. Thomas, 540 U.S. 20, 23, 124 S. Ct. 376, 379 (2003); Barnhart

v. Walton, 535 U.S. 212, 214, 122 S. Ct. 1265, 1268 (2002); Impala v. Astrue, 477 F. App'x 856,

857 (2d Cir. 2012).[8]

---

[8]     See also, e.g., Salmini v. Comm'r of Soc. Sec., 371 F. App'x 109, 111 (2d Cir. 2010);
        Betances v. Comm'r of Soc. Sec., 206 F. App'x 25, 26 (2d Cir. 2006); Surgeon v. Comm'r
        (continued...)

> An individual shall be determined to be under a disability only if [the combined effects of] his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B); see, e.g., Barnhart v. Thomas, 540 U.S. at 23, 124 S. Ct. at 379; Barnhart v. Walton, 535 U.S. at 218, 122 S. Ct. at 1270; Salmini v. Comm'r of Soc. Sec., 371 F. App'x at 111; Betances v. Comm'r of Soc. Sec., 206 F. App'x at 26; Butts v. Barnhart, 388 F.3d at 383; Draegert v. Barnhart, 311 F.3d at 472.[9/]

In determining whether an individual is disabled for disability benefit purposes, the Commissioner must consider: "(1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; and (4) the claimant's educational background, age, and work experience." Mongeur v. Heckler, 722 F.2d 1033, 1037 (2d Cir. 1983) (per curiam).[10/]

---

[8/]   (...continued)
of Soc. Sec., 190 F. App'x 37, 39 (2d Cir. 2006); Rodriguez v. Barnhart, 163 F. App'x 15, 16 (2d Cir. 2005); Malone v. Barnhart, 132 F. App'x 940, 941 (2d Cir. 2005); Butts v. Barnhart, 388 F.3d 377, 383 (2d Cir. 2004), amended on other grounds, 416 F.3d 101 (2d Cir. 2005); Veino v. Barnhart, 312 F.3d 578, 586 (2d Cir. 2002); Draegert v. Barnhart, 311 F.3d 468, 472 (2d Cir. 2002); Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000); Brown v. Apfel, 174 F.3d 59, 62 (2d Cir. 1999); Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir. 1999); Tejada v. Apfel, 167 F.3d 770, 773 (2d Cir. 1999); Balsamo v. Chater, 142 F.3d 75, 79 (2d Cir. 1998); Perez v. Chater, 77 F.3d 41, 46 (2d Cir. 1996).

[9/]   See also, e.g., Shaw v. Chater, 221 F.3d at 131-32; Rosa v. Callahan, 168 F.3d at 77; Balsamo v. Chater, 142 F.3d at 79.

[10/]  See, e.g., Brunson v. Callahan, No. 98-6229, 199 F.3d 1321 (table), 1999 WL 1012761 at *1 (2d Cir. Oct. 14, 1999); Brown v. Apfel, 174 F.3d at 62.

19

### B.     Standard Of Review

A court's review of the Commissioner's final decision is limited to determining whether there is "substantial evidence" in the record as a whole to support such determination. E.g., 42 U.S.C. § 405(g); Giunta v. Comm'r of Soc. Sec., 440 F. App'x 53, 53 (2d Cir. 2011).[11/] "'Thus, the role of the district court is quite limited and substantial deference is to be afforded the Commissioner's decision.'" Morris v. Barnhart, 02 Civ. 0377, 2002 WL 1733804 at *4 (S.D.N.Y. July 26, 2002) (Peck, M.J.).[12/]

The Supreme Court has defined "substantial evidence" as "'more than a mere scintilla [and] such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427 (1971); accord, e.g., Selian v. Astrue, 708 F.3d 409, 417 (2d Cir. 2013); Rosa v. Callahan, 168 F.3d at 77; Tejada v. Apfel, 167 F.3d at 773-74.[13/] "[F]actual issues need not have been resolved by the [Commissioner]

---

[11/]   See also, e.g., Prince v. Astrue, 514 F. App'x 18, 19 (2d Cir. 2013); Salmini v. Comm'r of Soc. Sec., 371 F. App'x 109, 111 (2d Cir. 2010); Acierno v. Barnhart, 475 F.3d 77, 80-81 (2d Cir.), cert. denied, 551 U.S. 1132, 127 S. Ct. 2981 (2007); Halloran v. Barnhart, 362 F.3d 28, 31 (2d Cir. 2004); Jasinski v. Barnhart, 341 F.3d 182, 184 (2d Cir. 2003); Veino v. Barnhart, 312 F.3d 578, 586 (2d Cir. 2002); Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000); Brown v. Apfel, 174 F.3d 59, 61 (2d Cir. 1999); Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir. 1999); Tejada v. Apfel, 167 F.3d 770, 773 (2d Cir. 1999); Perez v. Chater, 77 F.3d 41, 46 (2d Cir. 1996); Rivera v. Sullivan, 923 F.2d 964, 967 (2d Cir. 1991); Mongeur v. Heckler, 722 F.2d 1033, 1038 (2d Cir. 1983) (per curiam); Dumas v. Schweiker, 712 F.2d 1545, 1550 (2d Cir. 1983).

[12/]   See also, e.g., Florencio v. Apfel, 98 Civ. 7248, 1999 WL 1129067 at *5 (S.D.N.Y. Dec. 9, 1999) (Chin, D.J.) ("The Commissioner's decision is to be afforded considerable deference; the reviewing court should not substitute its own judgment for that of the Commissioner, even if it might justifiably have reached a different result upon a de novo review." (quotations & alterations omitted)).

[13/]   See also, e.g., Halloran v. Barnhart, 362 F.3d at 31; Jasinski v. Barnhart, 341 F.3d at 184; Veino v. Barnhart, 312 F.3d at 586; Shaw v. Chater, 221 F.3d at 131; Brown v. Apfel, 174 (continued...)

20

in accordance with what we conceive to be the preponderance of the evidence." Rutherford v.

Schweiker, 685 F.2d 60, 62 (2d Cir. 1982), cert. denied, 459 U.S. 1212, 103 S. Ct. 1207 (1983).  The

Court must be careful not to "'substitute its own judgment for that of the [Commissioner], even if

it might justifiably have reached a different result upon a de novo review.'" Jones v. Sullivan, 949

F.2d 57, 59 (2d Cir. 1991).[14]

      The Court, however, will not defer to the Commissioner's determination if it is "'the

product of legal error.'" E.g., Duvergel v. Apfel, 99 Civ. 4614, 2000 WL 328593 at *7 (S.D.N.Y.

Mar. 29, 2000) (Peck, M.J.); see also, e.g., Douglass v. Astrue, 496 F. App'x 154, 156 (2d Cir.

2012); Butts v. Barnhart, 388 F.3d 377, 384 (2d Cir. 2004), amended on other grounds, 416 F.3d 101

(2d Cir. 2005); Tejada v. Apfel, 167 F.3d at 773 (citing cases).

      The Commissioner's regulations set forth a five-step sequence to be used in

evaluating disability claims.  20 C.F.R. §§ 404.1520, 416.920; see, e.g., Barnhart v. Thomas, 540

U.S. 20, 24-25, 124 S. Ct. 376, 379-80 (2003); Bowen v. Yuckert, 482 U.S. 137, 140, 107 S. Ct.

2287, 2291 (1987).  The Supreme Court has articulated the five steps as follows:

> Acting pursuant to its statutory rulemaking authority, the agency has promulgated
> regulations establishing a five-step sequential evaluation process to determine
> disability.  If at any step a finding of disability or nondisability can be made, the SSA
> will not review the claim further.  [1] At the first step, the agency will find
> nondisability unless the claimant shows that he is not working at a "substantial
> gainful activity."  [2] At step two, the SSA will find nondisability unless the claimant
> shows that he has a "severe impairment," defined as "any impairment or combination
> of impairments which significantly limits [the claimant's] physical or mental ability
> to do basic work activities."  [3] At step three, the agency determines whether the
> impairment which enabled the claimant to survive step two is on the list of

---

[13]    (...continued)
    F.3d at 61; Perez v. Chater, 77 F.3d at 46.

[14]    See also, e.g., Campbell v. Astrue, 465 F. App'x 4, 6 (2d Cir. 2012); Veino v. Barnhart, 312
    F.3d at 586.

impairments presumed severe enough to render one disabled; if so, the claimant qualifies. [4] If the claimant's impairment is not on the list, the inquiry proceeds to step four, at which the SSA assesses whether the claimant can do his previous work; unless he shows that he cannot, he is determined not to be disabled. [5] If the claimant survives the fourth stage, the fifth, and final, step requires the SSA to consider so-called "vocational factors" (the claimant's age, education, and past work experience), and to determine whether the claimant is capable of performing other jobs existing in significant numbers in the national economy.

Barnhart v. Thomas, 540 U.S. at 24-25, 124 S. Ct. at 379-80 (fns. & citations omitted); accord, e.g.,

Talavera v. Astrue, 697 F.3d 145, 151 (2d Cir. 2012); Rosa v. Callahan, 168 F.3d at 77; Tejada v.

Apfel, 167 F.3d at 774.[15/]

The claimant bears the burden of proof as to the first four steps; if the claimant meets

the burden of proving that he cannot return to his past work, thereby establishing a prima facie case,

the Commissioner then has the burden of proving the last step, that there is other work the claimant

can perform considering not only his medical capacity but also his age, education and training. See,

e.g., Barnhart v. Thomas, 540 U.S. at 25, 124 S. Ct. at 379-80.[16/]

**C.     The Treating Physician Rule**

The "treating physician's rule" is a series of regulations set forth by the Commissioner

in 20 C.F.R. § 404.1527 detailing the weight to be accorded a treating physician's opinion.

Specifically, the Commissioner's regulations provide that:

If we find that a treating source's opinion on the issue(s) of the nature and severity

---

[15/]   See also, e.g., Jasinski v. Barnhart, 341 F.3d at 183-84; Shaw v. Chater, 221 F.3d at 132; Brown v. Apfel, 174 F.3d at 62; Balsamo v. Chater, 142 F.3d 75, 79-80 (2d Cir. 1998); Perez v. Chater, 77 F.3d at 46; Dixon v. Shalala, 54 F.3d 1019, 1022 (2d Cir. 1995); Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir. 1982).

[16/]   See also, e.g., Selian v. Astrue, 708 F.3d at 418; Betances v. Comm'r of Soc. Sec., 206 F. App'x 25, 26 (2d Cir. 2006); Green-Younger v. Barnhart, 335 F.3d 99, 106 (2d Cir. 2003); Rosa v. Callahan, 168 F.3d at 80; Perez v. Chater, 77 F.3d at 46; Berry v. Schweiker, 675 F.2d at 467.

22

of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight.

20 C.F.R. § 404.1527(c)(2); see, e.g., Rugless v. Comm'r of Soc. Sec., 548 F. App'x 698, 699-700 (2d Cir. 2013); Meadors v. Astrue, 370 F. App'x 179, 182 (2d Cir. 2010); Colling v. Barnhart, 254 F. App'x 87, 89 (2d Cir. 2007); Lamorey v. Barnhart, 158 F. App'x 361, 362 (2d Cir. 2006).

Further, the regulations specify that when controlling weight is not given a treating physician's opinion (because it is not "well-supported" by other medical evidence), the ALJ must consider the following factors in determining the weight to be given such an opinion: (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship; (3) the evidence that supports the treating physician's report; (4) how consistent the treating physician's opinion is with the record as a whole; (5) the specialization of the physician in contrast to the condition being treated; and (6) any other factors which may be significant. 20 C.F.R. § 404.1527(c)(2)-(6); see, e.g., Cichocki v. Astrue, 534 F. App'x 71, 74 (2d Cir. 2013); Gunter v. Comm'r of Soc. Sec., 361 F. App'x 197, 197 (2d Cir. 2010); Foxman v. Barnhart, 157 F. App'x 344, 346-47 (2d Cir. 2005); Halloran v. Barnhart, 362 F.3d 28, 32 (2d Cir. 2004); Shaw v. Chater, 221 F.3d 126, 134 (2d Cir. 2000); Clark v. Comm'r of Soc. Sec., 143 F.3d 115, 118 (2d Cir. 1998); Schaal v. Apfel, 134 F.3d 496, 503 (2d Cir. 1998).

When a treating physician provides a favorable report, the claimant "is entitled to an express recognition from the [ALJ or] Appeals Council of the existence of [the treating physician's] favorable . . . report and, if the [ALJ or] Council does not credit the findings of that report, to an explanation of why it does not." Snell v. Apfel, 177 F.3d 128, 134 (2d Cir. 1999); see, e.g., Cichocki v. Astrue, 534 F. App'x at 75; Zabala v. Astrue, 595 F.3d 402, 409 (2d Cir. 2010) (ALJ's failure to consider favorable treating physician evidence ordinarily requires remand pursuant to

Snell but does not require remand where the report was "essentially duplicative of evidence

considered by the ALJ"); Ferraris v. Heckler, 728 F.2d 582, 587 (2d Cir. 1984) ("We of course do

not suggest that every conflict in a record be reconciled by the ALJ or the Secretary, but we do

believe that the crucial factors in any determination must be set forth with sufficient specificity to

enable [reviewing courts] to decide whether the determination is supported by substantial evidence."

(citations omitted)); Ramos v. Barnhart, 02 Civ. 3127, 2003 WL 21032012 at *7, *9 (S.D.N.Y. May

6, 2003) (The ALJ's "'failure to mention such [treating physician report] evidence and set forth the

reasons for his conclusions with sufficient specificity hinders [this Court's] ability . . . to decide

whether his determination is supported by substantial evidence.'").

> The Commissioner's "treating physician" regulations were approved by the Second

Circuit in Schisler v. Sullivan, 3 F.3d 563, 568 (2d Cir. 1993).

### D.    The ALJ's Duty To Develop The Record

> It is the "well-established rule in [the Second] circuit" that the ALJ must develop the

record:

> > [I]t is the well-established rule in our circuit "that the social security ALJ, unlike a
> > judge in a trial, must on behalf of all claimants . . . affirmatively develop the record
> > in light of the essentially non-adversarial nature of a benefits proceeding." Lamay v.
> > Comm'r of Soc. Sec., 562 F.3d 503, 508–09 (2d Cir. 2009) (internal quotation marks
> > and brackets omitted) [, cert. denied, 559 U.S. 962, 130 S. Ct. 1503 (2010)]; accord
> > Butts v. Barnhart, 388 F.3d 377, 386 (2d Cir. 2004), [amended on other grounds],
> > 416 F.3d 101 (2d Cir. 2005); Pratts v. Chater, 94 F.3d 34, 37 (2d Cir. 1996); see also
> > Gold v. Sec'y of Health, Educ. & Welfare, 463 F.2d 38, 43 (2d Cir. 1972) (pro se
> > claimant). Social Security disability determinations are "investigatory, or
> > inquisitorial, rather than adversarial." Butts, 388 F.3d at 386 (internal quotation
> > marks omitted). "[I]t is the ALJ's duty to investigate and develop the facts and
> > develop the arguments both for and against the granting of benefits." Id. (internal
> > quotation marks omitted); accord Tejada v. Apfel, 167 F.3d 770, 774 (2d Cir. 1999).

Moran v. Astrue, 569 F.3d 108, 112-13 (2d Cir. 2009). This duty is heightened when a claimant

proceeds pro se.  See, e.g., Moran v. Astrue, 569 F.3d at 113; Hamilton v. Colvin, 10 Civ. 9641,

24

2013 WL 3814291 at *13 (S.D.N.Y. July 23, 2013).

## II.     APPLICATION TO PRINCE'S CLAIM

### A.     Prince Was Not Engaged In Substantial Gainful Activity

The first inquiry is whether Prince was engaged in substantial gainful activity after his application for DIB and SSI benefits.  "Substantial gainful activity" is defined as work that involves "doing significant and productive physical or mental duties" and "[i]s done (or intended) for pay or profit." 20 C.F.R.  § 404.1510.  ALJ Hecht's conclusion that Prince did not engage in substantial gainful activity during the applicable time period (see page 12 above) is not disputed by Prince or the Commissioner.  (See generally Dkt. Nos. 13 & 26: Gov't Brs.; Dkt. Nos. 25 & 33: Prince Brs.)

### B.     Prince Demonstrated "Severe" Impairments That Significantly Limited His Ability To Do Basic Work Activities

The second step of the analysis is to determine whether Prince proved that he had a severe impairment or combination of impairments that "significantly limit[ed his] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1521(a).  The ability to do basic work activities is defined as "the abilities and aptitudes necessary to do most jobs."  20 C.F.R. § 404.1521(b). "Basic work activities" include:

> walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling . . . seeing, hearing, and speaking . . . [u]nderstanding, carrying out, and remembering simple instructions . . . [u]se of judgment . . . [r]esponding appropriately to supervision, co-workers and usual work situations . . . [d]ealing with changes in a routine work setting.

20 C.F.R. § 404.1521(b)(1)-(6).

ALJ Hecht found that Prince's bronchial asthma, bipolar disorder and anxiety disorder constituted severe impairments.  (See page 12 above.)  The Commissioner does not dispute this

finding.  (See generally Dkt. Nos. 13 & 26: Gov't Brs.)  ALJ Hecht also found that although Prince

alleged disabling back pain, "the medical evidence fails to establish that [Prince] has any 'severe'

impairment of the spine or any other disorder that causes the back pain alleged."  (See page 13

above.)  Prince, represented by counsel, does not challenge ALJ Hecht's determination that his

alleged back pain does not meet the standard for a severe impairment.  (See generally Dkt. Nos. 25

& 33: Prince Brs.)  The Court therefore will proceed to the third step of the five-part analysis.

### C.      Prince Did Not Have A Disability Listed In Appendix 1 Of The Regulations

    The third step of the five-step test requires a determination of whether Prince had an

impairment listed in Appendix 1 of the Regulations.  20 C.F.R., Pt. 404, Subpt. P, App. 1.  "These

are impairments acknowledged by the [Commissioner] to be of sufficient severity to preclude

gainful employment.  If a claimant's condition meets or equals the 'listed' impairments, he or she is

conclusively presumed to be disabled and entitled to benefits."  Dixon v. Shalala, 54 F.3d 1019,

1022 (2d Cir. 1995).

    ALJ Hecht found that notwithstanding Prince's severe bronchial asthma, bipolar

disorder and anxiety disorder, Prince "does not have an impairment or combination of impairments

that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P,

Appendix 1."  (See page 13 above.)  ALJ Hecht found that Prince's asthma "clearly does not meet

or medically equal the requirements of section 3.03 for bronchial asthma."  (See page 13 above.)

ALJ Hecht specifically found Prince's mental impairments "do not meet or medically equal the

requirements of listings 12.04 (for affective disorders), or 12.06 (for anxiety disorders)."  (See page

13 above.)

    Prince is represented by experienced counsel and does not argue that any of his

impairments meet or equal a Listed condition.  (See generally Dkt. Nos. 25 & 33: Prince Brs.)  The

26

Court therefore proceeds with the analysis.

### D.   Residual Functional Capacity And Credibility Determinations

#### 1.   Residual Functional Capacity ("RFC") Determination

ALJ Hecht found that Prince had the RFC to "sit, stand or walk for up to six hours, with normal breaks, in an eight hour workday, and lift/carry/push/pull objects weighing up to 20 pounds occasionally," which he characterized as exertional limitations, and that Prince "is limited to light work." (See pages 13-14 above.) ALJ Hecht found that with respect to nonexertional limitations, Prince "is also limited to unskilled work involving the performance of simple one or two [step] tasks, and is unable to work in environments with high levels of respiratory irritants." (See page 14 above.) Prince raises numerous challenges to ALJ Hecht's RFC determination. (See generally Dkt. No. 25: Prince Br.) Because none are fatal to ALJ Hecht's determination and because as discussed below, remand at step five of the sequential analysis is required, the Court addresses each only briefly.

Prince challenges ALJ Hecht's determination that Prince only needs to avoid environments with a high level of respiratory irritants, asserting that ALJ Hecht misquoted the conclusion of consultative internist Dr. Thukral. (Prince Br. at 14.) According to Prince, ALJ Hecht "concluded that [Prince] only needs to avoid environments with a 'high level of respiratory irritants' and then . . . further stated that this was also the conclusion of Dr. Thukral . . . [b]ut Dr. Thukral did not say that." (Prince Br. at 14.) Prince is correct that Dr. Thukral opined that Prince should "avoid smoke, dust, or other respiratory irritants due to asthma History." (See page 9 above.) Prince argues that, contrary to ALJ Hecht's characterization, Dr. Thukral's opinion should be understood to mean that Prince "can tolerate only very little dust." (See Prince Br. at 14.) Dr. Thukral's opinion (R. 319) contains no such limitation. (See pages 8-9 above.) Furthermore, in determining that Prince is only

27

restricted from exposure to high levels of respiratory irritants, ALJ Hecht reviewed all of the objective medical evidence in the record (see page 14 above), and his finding is supported by the results of Dr. Thukral's January 2013 examination, which showed normal results for Prince's chest and lungs (see pages 8-9 above). ALJ Hecht also considered the treatment notes from Lincoln Medical Center which indicate that when Prince was treated in the emergency room for asthma exacerbation in September 2012, he reported experiencing such symptoms "only with extreme physical exertion." (See pages 7, 14 above). Finally, ALJ Hecht considered Prince's own statements that he exercises regularly and can walk one mile. (See pages 3, 7-8, 14 above.) Thus, ALJ Hecht's determination was consistent with the medical evidence of record, Prince's stated level of activity, and with Dr. Thukral's examination results, notwithstanding that ALJ Hecht misstated Dr. Thukral's conclusion.[17]

Prince similarly challenges ALJ Hecht's statement that his RFC determination with respect to irritant levels matches Dr. Blackwell's conclusions, noting that the opinion cited by ALJ Hecht was not Dr. Blackwell's. (Prince Br. at 14.) Prince is correct that the physical RFC assessment relied on by ALJ Hecht with respect to the severity of Prince's asthma was actually performed by P. McKercher, a non-physician SSA decision-maker. (See pages 12, 15 above.) Nonetheless, despite ALJ Hecht's error in attributing that determination to Dr. Blackwell, ALJ Hecht accurately characterized McKercher's conclusion that Prince only was limited from "concentrated exposure" to dust. (See page 12 above.) That conclusion is consistent with the underlying medical evidence, including Prince's own statements about his level of activity and the conditions under

---

[17] Earlier in discussing the basis for his RFC determination ALJ Hecht accurately stated that "[t]he only restriction cited by Dr. Thukral was to avoid respiratory irritants due to his asthma history." (See page 14 above).

28

which he experienced asthma exacerbations. (See pages 5, 7-8 above.) Finally, although McKercher is not a physician, ALJ Hecht was allowed to consider his opinion in evaluating Prince's claim. See 20 C.F.R. §§ 404.1513(d)(3), 416.913(d)(3) (authorizing ALJs to consider evidence from other sources including public and private social welfare agency personnel).

Prince also argues that ALJ Hecht erred by "failing to even acknowledge" the opinion of consultative psychologist Dr. Kushner that Prince's psychiatric conditions "'may significantly interfere with [Prince's] ability to function on a daily basis['] . . . anywhere in his decision." (Prince Br. at 3, emphasis in original.) ALJ Hecht thoroughly discussed Dr. Kushner's opinion when determining Prince's RFC. (See page 15 above.) In particular, ALJ Hecht referred to Dr. Kushner's opinion that Prince could follow and understand simple directions and instructions, perform simple tasks independently, maintain a regular schedule, learn new tasks and may be able to perform some complex tasks under supervision. (See page 15 above.) Similarly, ALJ Hecht noted that Dr. Kushner "concluded that [Prince's] ability to make appropriate decisions, maintain attention and concentration, relate adequately with others, and appropriately deal with stress may be impaired by [his] psychiatric problems." (See page 15 above.) Thus, ALJ Hecht neither ignored nor rejected Dr. Kushner's opinion; his RFC determination includes a limitation to unskilled work involving "simple one or two [step] tasks" (See page 14 above), consistent with Dr. Kushner's opinion.

Finally, Prince contends that ALJ Hecht's RFC determination violated the treating physician's rule by failing to acknowledge or weigh treating psychiatrst Dr. Fruitman's July 2013 opinion that Prince "'currently is unfit to work,'" and "erred by failing to obtain a medical source statement from the treating psychiatrist, Dr. Fruitman." (Prince Br. at 2, 5.)

"[T]he opinion of a treating physician, or any doctor, that the claimant is 'disabled'

29

or 'unable to work' is not controlling," since such statements are not medical opinions, but rather "opinions on issues reserved to the Commissioner." Mack v. Comm'r of Soc. Sec., 12 Civ. 186, 2013 WL 5425730 at *8 (S.D.N.Y. Sept. 27, 2013); 20 C.F.R. §§ 404.1527(d)(1), 416.927(d)(1).[18/] Moreover, in rejecting a treating physician's opinion, an ALJ need not expressly enumerate each factor considered if the ALJ's reasoning and adherence to the treating physician rule is clear. See, e.g., Atwater v. Astrue, 512 F. App'x 67, 70 (2d Cir. 2013) (plaintiff "challenges the ALJ's failure to review explicitly each factor provided in 20 C.F.R. § 404.1527(c). We require no such slavish recitation of each and every factor where the ALJ's reasoning and adherence to the regulation are clear."); Halloran v. Barnhart, 362 F.3d 28, 31-32 (2d Cir. 2004) (affirming ALJ opinion which did not discuss the treating physician rule, but where "the substance of the treating physician rule was not traversed"). Indeed, Prince's counsel concedes that "Dr. Fruitman's opinion that [Prince] was disabled appears to be an . . . opinion on an issue that is reserved to the Commissioner." (Prince Br. at 2.)

Moreover, the Second Circuit has held that absence of a medical source statement from a treating physician does not require remand where "the record contains sufficient evidence from which an ALJ can assess the petitioner's residual functional capacity." Tankisi v. Comm'r of Soc. Sec., 521 F. App'x 29, 33-34 (2d Cir. 2013); see also, e.g., Pellam v. Astrue, 508 F. App'x 87, 90-91 (2d Cir. 2013) (ALJ had no further obligation to obtain a medical source statement from treating doctor because the record contained the treating physician's treatment notes and the consultative examining physician's opinion largely supported the ALJ's RFC determination); Rosa v.

---

[18/]    See also, e.g., Roma v. Astrue, 468 F. App'x 16, 18 (2d Cir. 2012); Priel v. Astrue, 453 F. App'x 84, 86 (2d Cir. 2011); Snell v. Apfel, 177 F.3d 128, 133 (2d Cir. 1999); Cruz v. Colvin, 12 Civ. 7346, 2013 WL 3333040 at *17 (S.D.N.Y. July 2, 2013) (Peck, M.J.), report & rec. adopted, 2014 WL 774966 (S.D.N.Y. Feb. 21, 2014).

Callahan, 168 F.3d 72, 79 n.5 (2d Cir. 1999) ("[W]here there are no obvious gaps in the administrative record, and where the ALJ already possesses a 'complete medical history,' the ALJ is under no obligation to seek additional information . . . ." (quoting Perez v. Chater, 77 F.3d 41, 48 (2d Cir. 1996)).  Because the record before ALJ Hecht contained detailed medical records from Prince's treatment with Dr. Fruitman at AllMed (see pages 5-7 above), ALJ Hecht was not required to obtain a medical source statement from Dr. Fruitman.

Because ALJ Hecht was not required to give Dr. Fruitman's opinion controlling weight or obtain a medical source statement, and because the case should be remanded at the fifth step for vocational expert testimony, the Court need not discuss these issues further.  On remand, the ALJ should take care to explain why Dr. Fruitman's opinion deserves the amount of weight the ALJ gives to it, avoid misstating the conclusions of the doctors relied upon, and accurately identify those whose opinions contribute to Prince's RFC determination.[19]

### 2.   Credibility

Because subjective symptoms  only lessen a claimant's RFC where the symptoms "'can reasonably be accepted as consistent with the objective medical evidence and other evidence,'

---

[19]    Prince also argues that ALJ Hecht erred in determining Prince's mental residual functional capacity by not including "many of the moderate limitations found by Dr. Blackwell." (Prince Br. at 15.)  At the same time, Prince claims that the "opinion from Dr. Blackwell should be given no or very little weight" because "Dr. Blackwell never examined" Prince, allegedly did not have the complete record because he examined Prince prior to Dr. Fruitman writing his July 2013 letter, and relied heavily on Dr. Kushner's opinion while allegedly committing a substantial omission by not noting that Dr. Kushner opined that Prince's mental impairments "'may significantly interfere'" with this ability to function on a daily basis. (Prince Br. at 16-17.)  These arguments are contradictory and without merit.  ALJ Hecht's mental RFC determination was more limited than Dr. Blackwell's opinion that Prince could perform semi-skilled work.  (See pages 12, 14.)  In any event, ALJ Hecht does not appear to have relied heavily on Dr. Blackwell's opinion at this stage of his finding; the bulk of his analysis of Prince's mental limitations was based on Prince's medical records from AllMed and the opinion of Dr. Kushner.  (See pages 14-15 above.)

31

the ALJ is not required to accept allegations regarding the extent of symptoms that are inconsistent

with the claimant's statements or similar evidence." Moulding v. Astrue, 08 Civ. 9824, 2009 WL

3241397 at *7 (S.D.N.Y. Oct. 8, 2009) (citation & emphasis omitted); see, e.g., Campbell v. Astrue,

465 F. App'x 4, 7 (2d Cir. 2012) ("As for the ALJ's credibility determination, while an ALJ 'is

required to take the claimant's reports of pain and other limitations into account,' he or she is 'not

require[d] to accept the claimant's subjective complaints without question.' Rather, the ALJ 'may

exercise discretion in weighing the credibility of the claimant's testimony in light of the other

evidence in the record.'" (citations omitted)); Genier v. Astrue, 606 F.3d 46, 49 (2d Cir. 2010)

("When determining a claimant's RFC, the ALJ is required to take the claimant's reports of pain and

other limitations into account, but is not required to accept the claimant's subjective complaints

without question; he may exercise discretion in weighing the credibility of the claimant's testimony

in light of the other evidence in the record." (citations omitted)); Brown v. Comm'r of Soc. Sec., 310

F. App'x 450, 451 (2d Cir. 2009) ("Where there is conflicting evidence about a claimant's pain, the

ALJ must make credibility findings.").[20/]  In addition, "courts must show special deference to an

---

[20/]    See also, e.g., Rivers v. Astrue, 280 F. App'x 20, 22 (2d Cir. 2008) (same); Thompson v.
Barnhart, 75 F. App'x 842, 845 (2d Cir. 2003) (ALJ properly found that plaintiff's
"description of her symptoms was at odds with her treatment history, her medication regime,
and her daily routine"); Snell v. Apfel, 177 F.3d 128, 135 (2d Cir. 1999); Norman v. Astrue,
912 F. Supp. 2d 33, 85 (S.D.N.Y. 2012) ("It is 'within the discretion of the [Commissioner]
to evaluate the credibility of plaintiff's complaints and render an independent judgment in
light of the medical findings and other evidence regarding the true extent of such
symptomatology.'"); Astolos v. Astrue, No. 06-CV-678, 2009 WL 3333234 at *12
(W.D.N.Y. Oct. 14, 2009) (ALJ properly determined that plaintiff's subjective pain
complaints were not supported by the medical record); Speruggia v. Astrue, No. 05-CV-
3532, 2008 WL 818004 at *11 (E.D.N.Y. Mar. 26, 2008) ("The ALJ 'does not have to accept
plaintiff's subjective testimony about her symptoms without question' and should determine
a plaintiff's credibility 'in light of all the evidence.'"); Soto v. Barnhart, 01 Civ. 7905, 2002
WL 31729500 at *6 (S.D.N.Y. Dec. 4, 2002) ("The ALJ has the capacity and the discretion
to evaluate the credibility of a claimant and to arrive at an independent judgment, in light of
(continued...)

32

ALJ's credibility determinations because the ALJ had the opportunity to observe plaintiff's demeanor while [the plaintiff was] testifying." Marquez v. Colvin, 12 Civ. 6819, 2013 WL 5568718 at *7 (S.D.N.Y. Oct. 9, 2013).[21]

When ruling that a claimant is not entirely credible, the ALJ must provide "specific reasons for the finding on credibility, supported by the evidence in the case record." SSR 96-7p, 1996 WL 374186 at *4 (July 2, 1996). The regulations set out a two-step process for assessing a claimant's statements about pain and other limitations:

> At the first step, the ALJ must decide whether the claimant suffers from a medically determinable impairment that could reasonably be expected to produce the symptoms alleged. . . . If the claimant does suffer from such an impairment, at the second step, the ALJ must consider the extent to which the claimant's symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence of record. The ALJ must consider statements the claimant or others make about his impairment(s), his restrictions, his daily activities, his efforts to work, or any other relevant statements he makes to medical sources during the course of examination or treatment, or to the agency during interviews, on applications, in letters, and in testimony in its administrative proceedings.

Genier v. Astrue, 606 F.3d at 49 (quotations, citation & brackets omitted).[22]

---

[20]     (...continued)
medical findings and other evidence, regarding the true extent of pain alleged by the claimant."); Brandon v. Bowen, 666 F. Supp. 604, 608 (S.D.N.Y. 1987) (same).

[21]     Accord, e.g., Campbell v. Astrue, 465 F. App'x at 7 ("[W]e have long held that '[i]t is the function of the [Commissioner], not ourselves, . . . to appraise the credibility of witnesses, including the claimant.'"); Nunez v. Astrue, 11 Civ. 8711, 2013 WL 3753421 at *7 (S.D.N.Y. July 17, 2013); Guzman v. Astrue, 09 Civ. 3928, 2011 WL 666194 at *7 (S.D.N.Y. Feb. 4, 2011); Ruiz v. Barnhart, 03 Civ. 10128, 2006 WL 1273832 at *7 (S.D.N.Y. May 10, 2006); Gernavage v. Shalala, 882 F. Supp. 1413, 1419 & n.6 (S.D.N.Y. 1995); Mejias v. Soc. Sec. Admin., 445 F. Supp. 741, 744 (S.D.N.Y. 1978) (Weinfeld, D.J.); Wrennick v. Sec'y of Health, Educ. & Welfare, 441 F. Supp. 482, 485 (S.D.N.Y. 1977) (Weinfeld D.J.).

[22]     Accord, e.g., Cichocki v. Astrue, 534 F. App'x 71, 75-76 (2d Cir. 2013); Campbell v. Astrue, 465 F. App'x at 7; Meadors v. Astrue, 370 F. App'x 179, 183 (2d Cir. 2010); Taylor v. (continued...)

33

In making his credibility determination, ALJ Hecht found that "[t]here is little objective evidence of any impairment causing exertional limitations" and that Prince's testimony "is not supported by any objective medical evidence in the record and is not at all credible." (See page 15 above.)  With respect to Prince's mental impairments, ALJ Hecht found that Prince's testimony was contradicted by his employment history,[23] his treatment records, and the results of his consultative examination.  (See page 15 above.)  ALJ Hecht specifically noted that although the "consultative psychiatric examination did indicate some problems with concentration[,] . . . the overall examination did not show disabling symptoms and . . . the results of the examination are somewhat put into question due to [Prince's] lack of candor concerning his drug history." (See pages 15-16 above.)  ALJ Hecht therefore determined that "[w]hile it is clear that [Prince] has a diagnosed mental illness, . . . he has attempted to portray himself as a lot more impaired than he actually is." (See page 16 above.)

Because Prince's briefs, written by experienced counsel, do not challenge ALJ Hecht's credibility determination (see generally Dkt. Nos. 25 & 33: Prince Brs.), and because the case should be remanded on other grounds, the Court need not further address the ALJ's credibility determination.

---

[22]    (...continued)
Barnhart, 83 F. App'x 347, 350-51 (2d Cir. 2003); 20 C.F.R. § 416.945(a)(1), (3); SSR 96-7p, 1996 WL 374186 at *2.

[23]    Significantly, Prince claimed his PTSD was caused by witnessing the September 11, 2001 attack, but he continued to work until his job was eliminated in 2008.  (See page 3 above.) Prince testified he could not sit for more than seven minutes, but he also said chess was his hobby and he and a friend "sit there and we play a couple games of chess" (see page 3 above), which clearly takes far more than seven minutes, and also requires concentration.

34

**E.      Prince Did Not Have The Ability To Perform His Past Relevant Work**

         The fourth step of the five-step analysis asks whether Prince had the RFC to perform

his past relevant work.  (See page 20 above.)  ALJ Hecht found that Prince "is unable to perform his

past relevant work" as a helper on a water delivery truck because that work "had medium exertional

demands," while the ALJ found that Prince was "limited to light work."  (See pages 14, 16 above.)

         Because ALJ Hecht's findings at this stage are not challenged by Prince or the

Commissioner (see generally Dkt. Nos. 13 & 26: Gov't Brs.; Dkt. Nos. 25 & 33: Prince Brs.), the

Court proceeds to step five of the five-step analysis.

**F.      ALJ Hecht's Reliance On The Medical-Vocational Guidelines Requires Remand**

         In the fifth step, the burden shifts to the Commissioner, "who must produce evidence

to show the existence of alternative substantial gainful work which exists in the national economy

and which the claimant could perform, considering not only his physical capability, but as well his

age, his education, his experience and his training."  Parker v. Harris, 626 F.2d 225, 231 (2d Cir.

1980).[24/]

                 In meeting his burden under the fifth step, the Commissioner:

                 may rely on the medical-vocational guidelines contained in 20 C.F.R. Part 404,
                 Subpart P, App. 2, commonly referred to as "the Grid".  The Grid takes into account
                 the claimant's residual functional capacity in conjunction with the claimant's age,
                 education and work experience.  Based on these factors, the Grid indicates whether
                 the claimant can engage in any other substantial gainful work which exists in the
                 national economy.  Generally the result listed in the Grid is dispositive on the issue
                 of disability.

---

[24/]     See, e.g., Roma v. Astrue, 468 F. App'x 16, 20 (2d Cir. 2012); Arruda v. Comm'r of Soc.
          Sec., 363 F. App'x 93, 95 (2d Cir. 2010); Butts v. Barnhart, 388 F.3d 377, 381 (2d Cir.
          2004), amended on other grounds, 416 F.3d 101 (2d Cir. 2005); Rosa v. Callahan, 168 F.3d
          72, 77 (2d Cir. 1999).

Zorilla v. Chater, 915 F. Supp. 662, 667 (S.D.N.Y. 1996) (fn. omitted); see, e.g., Heckler v.

Campbell, 461 U.S. 458, 461-62, 465-68, 103 S. Ct. 1952, 1954-55, 1956-58 (1983) (upholding the

promulgation of the Grid); Roma v. Astrue, 468 F. App'x at 20-21; Martin v. Astrue, 337 F. App'x

87, 90 (2d Cir. 2009); Rosa v. Callahan, 168 F.3d at 78; Perez v. Chater, 77 F.3d 41, 46 (2d Cir.

1996); Bapp v. Bowen, 802 F.2d 601, 604 (2d Cir. 1986).

However, "relying solely on the Grids is inappropriate when nonexertional limitations

'significantly diminish' plaintiff's ability to work so that the Grids do not particularly address

plaintiff's limitations." Vargas v. Astrue, 10 Civ. 6306, 2011 WL 2946371 at *13 (S.D.N.Y. July

20, 2011); see also, e.g., Travers v. Astrue, 10 Civ. 8228, 2011 WL 5314402 at *10 (S.D.N.Y. Nov.

2, 2011) (Peck, M.J.), report & rec. adopted, 2013 WL 1955686 (S.D.N.Y. May 13, 2013); Lomax

v. Comm'r of Soc. Sec., No. 09-CV-1451, 2011 WL 2359360 at *3 (E.D.N.Y. June 6, 2011) ("Sole

reliance on the grids is inappropriate, however, where a claimant's nonexertional impairments

'significantly limit the range of work permitted by his exertional limitations.'").

Rather, where the claimant's nonexertional limitations "'significantly limit the range

of work permitted by his exertional limitations,' the ALJ is required to consult with a vocational

expert." Zabala v. Astrue, 595 F.3d 402, 410 (2d Cir. 2010) (quoting Bapp v. Bowen, 802 F.2d at

605); see also, e.g., Selian v. Astrue, 708 F.3d 409, 421 (2d Cir. 2013) ("We have explained that the

ALJ cannot rely on the Grids if a non-exertional impairment has any more than a 'negligible' impact

on a claimant's ability to perform the full range of work, and instead must obtain the testimony of

a vocational expert."); Rosa v. Callahan, 168 F.3d at 82 ("Where significant nonexertional

impairments are present at the fifth step in the disability analysis, however, 'application of the grids

is inappropriate.' Instead, the Commissioner 'must introduce the testimony of a vocational expert

(or other similar evidence) that jobs exist in the economy which claimant can obtain and perform.'"

36

(quoting & citing <u>Bapp</u> v. <u>Bowen</u>, 802 F.2d at 603, 605-06)); <u>Suarez</u> v. <u>Comm'r of Soc. Sec.</u>, No. 09-CV-338, 2010 WL 3322536 at *9 (E.D.N.Y. Aug. 20, 2010) ("If a claimant has nonexertional limitations that 'significantly limit the range of work permitted by his exertional limitations,' the ALJ is required to consult with a vocational expert." (quoting <u>Zabala</u> v. <u>Astrue</u>, 595 F.3d at 411)).

ALJ Hecht relied exclusively upon the medical-vocational guidelines to determine that jobs exist in significant number in the national economy that Prince can perform. (<u>See</u> page 16 above.)  In doing so, ALJ Hecht discussed the standard for use of the Grid, but omitted any discussion of when a vocational expert's testimony is required and did not properly apply the standard to Prince's claim. (<u>See</u> page 16 above.) ALJ Hecht wrote:

> If [Prince] had the residual functional capacity to perform the full range of light work, considering [his] age, education, and work experience, a finding of "not disabled" would be directed by Medical-Vocational Rule 202.13. In this case, [Prince's] additional limitations have little effect on the occupational base of unskilled light work. A finding of "not disabled" is therefore appropriate under the framework of this rule. [Prince's] environment restrictions from his mild, controlled asthma clearly do not significantly reduce the number of sedentary and light jobs available to [him]. Further, SSR 85-15 provides that the basic mental demands of competitive, remunerative, unskilled work include the abilities (on a sustained basis) to understand, carry out, and remember simple instructions; to respond appropriately to supervision, coworkers, and usual work situations; and to deal with changes in a routine work setting. A substantial loss of ability to meet any of these basic work-related activities would severely limit the potential occupational base. The record shows that [Prince] has the ability to meet these mental demands of unskilled work. Since [Prince] still retains the residual functional capacity to carry out those basic mental demands of unskilled work, there exists no significant erosion of the occupational base.

(<u>See</u> pages 16-17 above.)

Prince argues that ALJ Hecht erred by relying on SSR 85-15 rather than obtaining testimony from a vocational expert regarding whether there are a significant number of jobs in the national economy that Prince could perform despite his limitations. (<u>See</u> Dkt. No. 25: Prince Br. at 6-13; Dkt. No. 33: Prince Reply Br. at 7-10.)

Case 1:13-cv-07666-TPG   Document 35   Filed 03/27/15   Page 38 of 42
Case 1:13-cv-07666-TPG-AJP   Document 34   Filed 03/09/15   Page 37 of 41

37

ALJ Hecht's reliance on SSR 85-15 to determine that Prince's nonexertional limits do not significantly limit the range of work open to him was misplaced.  First, SSR 85-15 applies only where the plaintiff suffers solely from nonexertional limitations, and does not apply where the plaintiff suffers from a combination of exertional and nonexertional impairments.  E.g., Roma v. Astrue, 468 F. App'x 16, 20 (2d Cir. 2012) ("SSR 85–15, descriptively titled 'The Medical–Vocational Rules as a Framework for Evaluating Solely Nonexertional Impairments,' does not apply to a case, such as this one, in which the claimant suffers from a combination of exertional and non-exertional impairments." (emphasis in original)); Lugo v. Colvin, 13 Civ. 1767, 2014 WL 5045630 at *13 (S.D.N.Y. Oct. 9, 2014) ("[T]he ALJ did not specify whether she considered plaintiff's ulnar nerve condition to be exertional or nonexertional. If it is exertional, then SSR 85–15 has no applicability to this case. SSR 85–15 applies only where the claimant suffers from solely nonexertional impairments."); see also SSR 85-15, 1985 WL 56857 at *2 ("This [policy statement] clarifies policies applicable in cases involving the evaluation of solely nonexertional impairments.").  Prince has both exertional and nonexertional limitations (see pages 13-14 above), and thus by its own terms, SSR 85-15 is inapplicable to Prince.

Furthermore, ALJ Hecht's RFC determination provides for nonexertional limits based on Prince's mental impairments arguably more restrictive than those discussed in SSR 85-15.  SSR 85-15 states, among other requirements, that the "basic mental demands of competitive, remunerative, unskilled work include the abilities (on a sustained basis) to understand, carry out, and remember simple instructions " in a "routine work setting."  SSR 85-15, 1985 WL 56857 at *4-5.  ALJ Hecht, however, found that Prince is "limited to unskilled work involving the performance of simple one or two [step] tasks."  (See page 14 above.)  The language used by ALJ Hecht in assessing Prince's mental impairments parallels that used by the Dictionary of Occupational Titles to describe

38

jobs requiring a reasoning development level of one. Dictionary of Occupational Titles at 1011 (4th ed. 1991) ("Apply commonsense understanding to carry out simple one- or two-step instructions.").

   Prince points to several recent cases from outside this Circuit to argue that courts which have considered the issue have found that the ability to perform jobs involving only one or two-step tasks correspond to jobs with a reasoning level of one. (Prince Br. at 8, citing Aragon v. Colvin, No. EDCV 12-1647, 2013 WL 3306091 at *3 (C.D. Cal. July 1, 2013) ("The limitation to one- and two-step instructions parallels the language contained in the description of Reasoning Level One, as distinguished from Reasoning Level Two."); Cardoza v. Astrue, No. EDCV 10-936, 2011 WL 1211469 at *5-6 (C.D. Cal. Mar. 29, 2011) (collecting cases)). By contrast, in cases involving plaintiffs without the additional limitation present in Prince's case, courts in this Circuit have held that a RFC determination limiting a plaintiff to simple and routine tasks means that a plaintiff is capable of working at reasoning development level two. See, e.g., Rivera v. Colvin, 11 Civ. 7469, 2014 WL 3732317 at *42 (S.D.N.Y. July 28, 2014) ("Most courts, in this circuit and others, have held that an RFC that limits a claimant to only simple and routine tasks is consistent with GED level 2 reasoning." (emphasis omitted)); Edwards v. Astrue, No. 07-CV-898, 2010 WL 3701776 at *15 (N.D.N.Y. Sept. 16, 2010) ("Working at reasoning level 2 does not contradict a mandate that work be simple, routine and repetitive."); see also Dictionary of Occupational Titles at 1011 (reasoning development level two requires an individual to be able to "[a]pply commonsense understanding to carry out detailed but uninvolved written or oral instructions"). ALJ Hecht did not explain how he determined that Prince "has the ability to meet [SSR 85-15's] mental demands of unskilled work," notwithstanding Prince's additional limitation to one or two-step tasks. (See page 17 above.) Thus, it is unclear whether SSR 85-15 would be applicable to Prince even if he had only nonexertional limitations.

39

Aside from his reliance on SSR 85-15, ALJ Hecht did not explain his conclusion that "there exists no significant erosion of the occupational base" as a result of Prince's nonexertional mental limitations. (See pages 16-17 above.) In relying upon the Grids, rather than the testimony of a vocational expert, however, ALJ Hecht was obligated to explain his finding that Prince's nonexertional limitations had only a negligible impact on the range of work permitted by his exertional limitations. See, e.g., Selian v. Astrue, 708 F.3d 409, 421 (2d Cir. 2013) ("We have explained that the ALJ cannot rely on the Grids if a non-exertional impairment has any more than a 'negligible' impact on a claimant's ability to perform the full range of work, and instead must obtain the testimony of a vocational expert."); Hernandez v. Colvin, 13 Civ. 3035, 2014 WL 388415 at *15 (S.D.N.Y. Aug. 7, 2014); Cruz v. Colvin, 12 Civ. 7346, 2013 WL 3333040 at *19-20 (S.D.N.Y. July 2, 2013) (Peck, M.J.), report & rec. adopted, 2014 WL 774966 (S.D.N.Y. Feb. 21, 2014); Suarez v. Comm'r of Soc. Sec., No. 09-CV-338, 2010 WL 3322536 at *9 (E.D.N.Y. Aug. 20, 2010) ("If a claimant has nonexertional limitations that 'significantly limit the range of work permitted by his exertional limitations,' the ALJ is required to consult with a vocational expert." (quoting Zabala v. Astrue, 595 F.3d at 411)). Prince's nonexertional limitations may have had more than a negligible impact on his ability to work, since as Dr. Kushner opined, Prince's psychiatric conditions may significantly interfere with his ability to function on a daily basis (see pages 10-11 above), and since Prince's limitation to simple one and two-step tasks may leave him limited to jobs that require only reasoning development level one.

Under these circumstances, the ALJ was required to seek the opinion of a vocational expert rather than relying exclusively on the Grid. ALJ Hecht's failure to consult a vocational expert is a legal error that necessitates remand.

40

## CONCLUSION

For the reasons set forth above, the Commissioner's motion for judgment on the pleadings (Dkt. No. 12) should be DENIED, and Prince's motion for judgment on the pleadings (Dkt. No. 24) should be GRANTED to the extent of remanding the case to the Commissioner for further proceedings consistent with this Report and Recommendation.

## FILING OF OBJECTIONS TO THIS REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from service of this Report to file written objections. See also Fed. R. Civ. P. 6. Such objections (and any responses to objections) shall be filed with the Clerk of the Court, with courtesy copies delivered to the chambers of the Honorable Thomas P. Griesa, 500 Pearl Street, Room 1630, and to my chambers, 500 Pearl Street, Room 1370. Any requests for an extension of time for filing objections must be directed to Judge Griesa (with a courtesy copy to my chambers). Failure to file objections will result in a waiver of those objections for purposes of appeal. Thomas v. Arn, 474 U.S. 140, 106 S. Ct. 466 (1985); Ingram v. Herrick, 475 F. App'x 793, 793 (2d Cir. 2012); IUE AFL-CIO Pension Fund v. Herrmann, 9 F.3d 1049, 1054 (2d Cir. 1993), cert. denied, 513 U.S. 822, 115 S. Ct. 86 (1994); Frank v. Johnson, 968 F.2d 298, 300 (2d Cir.), cert. denied, 506 U.S. 1038, 113 S. Ct. 825 (1992); Small v. Sec'y of Health & Human Servs., 892 F.2d 15, 16 (2d Cir. 1989);

41

<u>Wesolek</u> v. <u>Canadair Ltd.</u>, 838 F.2d 55, 57-59 (2d Cir. 1988); <u>McCarthy</u> v. <u>Manson</u>, 714 F.2d 234, 237-38 (2d Cir. 1983).


Dated:        New York, New York
              March 9, 2015

                                  Respectfully submitted,

                                  _____

                                  **Andrew J. Peck**
                                  United States Magistrate Judge

Copies ECF to:  All Counsel
                Judge Thomas P. Griesa